David Netzer Consulting v. Shell Oil Mr. Garza, whenever you're ready. May it please the Court. The party's briefing focuses on the fourth step of the claim. But that's not the focus of the patent. Well, the claim has a fourth step. It does have a fourth step. It refers to fractionating the pyrolysis gasoline to get over 80 percent. And when you look at your patent specification column 2, the azeotrope description, that clearly refers to distillation. That's where you get the azeotropes. And I think it's pretty clear that the last step of the accused process is separation. It's not distillation. I agree that the last step of the process is separation and not just distillation. Then why doesn't that settle the case then? Because the accused doesn't meet one step of the claim. Again, I believe the term fractionation is broader than distillation. I believe subfractionation is any process that creates fractions and not just distillation. Aside from what you believe or what I believe, doesn't your specification indicate otherwise? No, Your Honor. The portion of the specification that you point to does not speak to azeotropes and generic fractionation. It does speak to azeotropes and conventional fractionation. And that term does have meaning. Conventional is a word that means usual or expected. And I will say in this- Wait, so your point being that the claim term fractionization is something other than conventional fractionization? Yes. Conventional is a limitation on the word fractionation. You don't mean other. You just broader. Correct. Fractionation is broader. Yes. Fractionation is broader than conventional fractionation. And that's again shown by our citations to the specification, including column three, that says that fractionation by conventional distillation may become difficult. And in claim 11, that says separation by conventional fractionation in a distillation column. So no, the intrinsic evidence does not support a finding that fractionation is limited to distillation. I'd like to move to the specification disclaimer arguments. One argument that Shell makes is that the motivation for this patent to take advantage of the market shift for impure benzene results in a disavowal of processes that use other separation techniques than distillation. As we've shown in our brief, the patent has more than one benefit. And according to Federal Circuit precedent, including the Golight case, when there's more than one benefit, each claim does not need to claim every benefit. And here, if Netzer had intended to limit his claim to impure benzene, the file history would look very different. So Shell has pointed to page A261 of file history. And that's where Netzer states that the claim process is particularly useful to make benzene that isn't completely pure. And then quickly pivots to contrast the Takahisa reference that tries to make high-purity benzene. Now, with this setup, it begs for an express disclaimer. Netzer could have said, claim one does not cover high-purity benzene, overcoming the Takahisa rejection. But Netzer didn't do that. What Netzer did is he pointed to the fact that Takahisa is looking for high-purity benzene to show why the Takahisa reference did not meet the first three steps of the claim. He said the Takahisa reference has no reason to separate out a benzene-rich fraction. The Takahisa reference has no reason to crack benzene in the toluene-rich fraction separately. And he argued that the Takahisa reference, if you did crack a benzene-rich fraction separately, you'd lose free radicals that were important to that invention. If Netzer had intended to limit his invention to impure benzene, he would have made that express disclaimer in the file history to overcome the Takahisa reference. Is there anything in the record, and I realize that the record is pretty thin here because of the way the proceeding unfolded in the district court, about why Shell, as you allege it has done, would use the separation of toluene followed by cracking of a mixture that includes benzene preceding the sulfolane process? What benefit it gets out of putting a different input, a cracked, a benzene cracked, or actually the benzene is not cracking, but putting a different input into step four. Does the sulfolane process get cheaper, get faster, or something? Or are we just silent on that because the record is so skimpy? The record is thin. So we have seen in the record indications that Shell did make this change to where they began. You accuse it of doing so, so that's your infringement contention, right? Yes, but there is in the record a pre- and post-2009 flow diagram that shows that this change to crack…  I don't believe so, but it is in the joint appendix. There's rather a lot that's marked confidential, including published patents and all kinds of things in the joint. In fact, the whole joint appendix says confidential material practically. Yes. Including all kinds of things that are not confidential. We were doing our best to accommodate the protective order that the court entered, and so we did file the information under seal as required by the court. Well, let me just get back to what I sort of understand to be the point. In the specification, you say there are new processes for making, what is it, ethyl benzene? That's one of the potential… that don't require such a pure benzene input. And if you don't require that, then you can now use a process to produce a somewhat less pure benzene product. And one of the ways that we can do that is by this B and C steps that first separates the toluene and then puts into a cracker something that people hadn't been putting into a cracker before, namely benzene, because why would you put it in there? It's not going to crack. And why would you waste all the energy doing that? But you now get a benefit out of that. And I gather your point is that doesn't mean that we are limiting that to… by the process that follows that. You can use this for anything. So my question is, would somebody of skill in the art have understood that the benefit of doing steps B and C, where you say the invention lies, would not extend to a separation process other than boiling point distillation? No, Your Honor. What someone of skill in the art reading the patent would recognize is that David Netzer saw a way to create pyrolysis gasoline in a different way. And he contended that this pyrolysis gasoline was a better way of creating benzene because it resulted in higher benzene concentration but also co-produced ethylene. Again, that was a big part of this invention. By using steps A, B, and C, not only do you get the benefit of moving benzene from a refinery source, the refurbate, into the chemical chain, but you also get these valuable byproducts, ethylene. That's not something that happened before. And someone of skill in the art would see that that co-production is a benefit that doesn't turn on the way you separate out those chemicals. The next part... Isn't there another aspect of the fourth limitation which reads fractionating pyrolysis gasoline to form a benzene product comprising at least 80% whereas Shell only fractionates to get to 57%? And of course we read the term fractionation different. We are looking at the entire chain between pyrolysis gasoline and benzene. And we believe you should look to all six process units and all the steps to determine fractionation. We don't think the read ends at the second distillation column. You know, one of the purposes of disclosure in a patent is precision. And if these terms are all slippery and indistinct, that doesn't lead to a very clear patent. The term fractionating I don't agree is slippery. Fractionating is a clear word. It is a functional variation of the word fraction, and it means getting to fractions. And he was specific to distillation when he intended it. The word distillation appears throughout the disclosure, and he chose not to use it here. That choice has meaning. So I disagree with the premise. Can I ask you, let's assume for purposes of this question that fractionating in step four, claim one, is limited to boiling point separation as opposed to separation for something else. Then the question arises, was it proper to grant summary judgment of no literal infringement? Do I take it your argument on that, on this assumption, which I know you disagree with your primary argument, is that when it says fractionating the pyrolysis gasoline to form a purified benzene product, that doesn't mean fractionating by boiling point separation and nothing else. You can have other steps in there the way your preferred embodiment has a hydrotreater step as part of step four. Correct. And there's two points I want to make sure are clear here. I'm sorry. And therefore, the accused product or the accused process has several boiling point distillations, you say, but also some other stuff. But your literal infringement contention on the claim construction implicitly adopted by the district court is that you can still accuse that of coming within fractionating because this doesn't say fractionating and no other process to form it. Correct. And the two points, the first is the one that you just made wonderfully, which is fractionation does not mean only fractionation. The preferred embodiment has other steps. But the other point I want to make sure and point out is shell oversells extraction's role in the sulfalane process. So I do want to turn you to their brief at page 10. If you turn to that. Well, doesn't extraction go from 57% to 99 plus? Isn't that extraction? So let me address that right here. So this is where Shell first addresses the sulfalane separation. And Shell says, in the sulfalane process, the benzene concentrate is fed to the extractor containing the sulfalane solvent. The sulfalane has a preferential affinity for aromatics. And then there's an ellipsis. Shell used the ellipsis to gloss over the role of volatility in the sulfalane separation. So they cite to page A272, and that is a Shell's engineer's declaration. So here's the part they left out. The sulfalane has a preferential affinity for aromatics, effectively making benzene behave as if it was less volatile, boil at a higher temperature than the non-aromatics. What Shell's engineer says is sulfalane makes benzene behave less volatile. So the solvent's important, and the extraction's important. But the solvent allows the volatility to change to allow separation by distillation. So the sulfalane separation is not extraction alone. It's extraction working hand-in-hand with distillation. And I'm already most of the way through my rebuttal time, so I'd like to reserve my two minutes. Fine. Thank you. Good morning, Your Honors, and may it please the Court. Kathleen Sullivan for Shell. Judge Lori had the case exactly right. Fractionation was written with specificity in this patent, and fractionation is improperly construed as meaning... ...alone in a way that limits what I take it from the joint appendix to be an extremely common and old generic use of the term to mean break it into parts. Not so, Your Honor. Fractionation is a specific term used two places in the patent. If I could get to... The genus is separation, and there are two species at stake here. One is fractionation, which is properly construed as separation by boiling points. Rather than fight the question, I read about six pieces of prior art as using the word fractionation as a genus. Now, you say I don't think there's any contrary prior art in the joint appendix. So you say in this patent, fractionation is only a species, boiling point separation as opposed to others. Where is that indicated by use of the term fractionation without an adjective in front of it? Your Honor, the term fractionation in Step 4 is distinct from the term separation in Step 2. Let's start at a... I'm sorry. That's a grammar point, not a science point. Fractionation applies to the whole. You would never say fractionate Part A from Part B. You would never say separate the whole. You need in Clause B, because what comes after it, separate this part from this other part. You could not grammatically have used the word fractionate in Step B. So that doesn't indicate that separation is... I'm sorry, that fractionation applies to only some subclass of techniques. It's simply an English language aspect of the fact that the direct object of fractionate is not the parts, it's the whole. Respectfully disagree, Your Honor, that the term fractionate without an adjective is crucial to the precision of Step 4. Step 4 says that what you do to the pyrolysis gasoline at Step 4 to get to 80% pure benzene is fractionate. Now, if we go back to the part of the specification Judge Lori was referring to earlier, which is page A20, column 2, lines 17 through 20... The azeotrope. The azeotrope section. And, Your Honor, now, Judge Toronto, I know you said, where is fractionation without an adjective? And the word conventional is here. But I want to focus on the more important aspect of this, of the contrast here. If we go to column 2, we see that Netzer says  It's the problem you referred to earlier, Your Honor, which is the problem of trying to use crackers to produce less pure benzene for a new market. Here's what he says in column 2. He says What's the problem? The problem is azeotropes create a liquid mixture of uniform boiling point. So without boiling point differentials, we can't fractionate. Fractionate here means distillation. Distillation means separation by using boiling point differentials. I'm sorry, but what you want to do is keep mushing together things that are stated more precisely. If you're using conventional fractionation, which is boiling point separation, then there's a problem with azeotropes. That doesn't say, once I take a step to solve that problem, that step is inapplicable to any form of separation that you later may choose to use. Well, Your Honor, that's so. But the key is that what I want to focus, Your Honor, on is the next paragraph. The next paragraph, Netzer tells us that the conventional way of solving the conventional I'm on column 2, starting at line 21. Page 820, column 2, starting at line 21. The conventional method of benzene purification and separation from the above azeotropes is by aromatic extraction or extractive distillation processes such as UOP's sulfalane process. That is our Shell's accused process. So Netzer has identified our process, UOP sulfalane, as extraction, as an extractive process. And he said it solves the azeotrope problem. Why is that? Because it uses solubility differentials. That's not disputed, Your Honor. Even my adversary has said in his brief that extraction is a technique that solves separation problems by solubility differentials, not by boiling point differentials. So, Your Honor, just to summarize, this section is contrasting fractionation, whether conventional or otherwise, on the one hand, with extraction or extractive processes on the other hand. And Netzer is saying, I've come along because there's a problem in the fractionation world, azeotropes. Shell has solved that through extraction, which is a solubility-based separation. Because we extract, Your Honor, we can't be practicing step four. We can't be fractionating because we're using solvents. And if I could just go back to the key, the key non-infringement evidence is not disputed. The evidence about Shell's processes is in the record at A940 to 941, and I have no confidentiality bar whatsoever in sharing with you what Judge Lori has already described. The extraction process that Shell practices is the one that purifies benzene from 57% by weight to 99% by weight. So the process, the undisputed step in Shell's sulfalane process that practices step four of claim one is not fractionation, it's extraction. It's the use of solvents, not boiling or heat. And because the way we get from 57% benzene to over 80% benzene, which is required by the precise words of step four, is extraction, not fractionation. Your Honor's question, with respect, it doesn't matter whether we're talking about conventional fractionation or ordinary fractionation by distillation. The key point is we perform the crucial separation step through extraction, and that's undisputed. It's at 940 to 941. It's the undisputed record of what our process is. And because we rely on extraction, we can't, as Judge Lori already described, infringe step four. So, Your Honor, if I could respectfully just suggest the genus's separation, there are multiple... Can I ask you back on that first point? Yeah. I didn't see, but maybe I missed it. Any source in extra patent materials that contradicted the proposition that the word fractionation is quite commonly used as a genus for all methods, all methods of breaking apart and separating, not just boiling point methods? Your Honor, I refer you to Red Brief, pages 23-24. Here, Red Brief, pages 23-24. Look, we admit that the extrinsic evidence is mixed. Sometimes people use fractionation to sound like it means lots of means of separation. We offer on pages 23 and 24 lots of external dictionaries and treatises, several dictionaries and treatises that use fractionation precisely to mean, as Judge Lori said, distillation. Can I ask about this? There are two different things you can say about extrinsic evidence or uses outside the patent that use the term in two different ways. One is there are different uses, all of which are perfectly permissible, and others are, no, nobody would ever use this term to mean anything other than boiling point distillation. I didn't take it that any of these uses did anything but say fractionation covers a lot of different kinds of separation. Your Honor, we cite the reference, the outside evidence, including opinions of this Court, at the bottom of 23 and the top of 24, that use fractionation in the sense that the Netzer patent uses fractionation, meaning fractionation is separation by boiling points. And what do you do with the evidence going back to, I think, the earliest one is 1957 patent and then 1963 patent and then on and on and on, talking about all kinds of different non-boiling point fractionations? Your Honor, then I would say that Netzer should have written his patent differently. If Netzer wanted to take advantage of fractionation as a generic term for all kinds of separation... But the word is just fractionating. There's no modifier in Step 4. But, Your Honor, the term fractionation is distinguished from extraction by Netzer himself. The specification informs the claim. With respect, I don't think we should even be talking about extrinsic evidence because inside the world of this patent, the specification at Column 2 informs the claim at Column 7, Step 4. And it's Netzer himself who said, listen to me, folks, there's a problem with fractionation. He says there's a problem with conventional fractionation, and the problem is azeotropes. And here's how I'm going to solve it. I'm going to come along and crack before you fractionate. Now, we're not on those steps. We're just on Step 4. That's the only thing that's before the court. And he said, why is my technique better? Because that stuff that Shell does, the UOP process, that solves azeotropes through solvents, through solubility, through extraction, not boiling points, but that's too expensive. That's too expensive and it makes the benzene too pure, more than the market needs. There's a market shift. That's why I gave you the invention. It's the major driving force behind my invention. What we learn from Netzer, then, we want to live inside the patent until it's not clear. What we learn from Netzer is he thinks fractionation, whether conventional or otherwise, is different from extraction or extractive distillation. Those processes have to be. They have to be different from fractionation because they solve the boiling point problem and they have to do it by something other than boiling points. Can I ask you the same question I asked Mr. Garza? Is there anything in the record that indicates whether if you use the sulfalane process, the extraction process, there's any benefit to doing what they accuse you of doing, namely going through the other steps as a precursor to that? Your Honor, no there is not because the record on summary judgment is limited to step four. With respect, we think the district court's judgment should be affirmed because the construction of fractionation as separation by boiling points is correct and we don't infringe step four. Your Honor, we have been doing this process for 50 years. It's our patented process, sulfalane. We've been doing it to produce pure benzene to sell to a pure benzene market. That's what we do. Netzer came along and he said, who needs such pure benzene? There's a market shift. I can help you with crackers to allow you to fractionate after cracking. And another evidentiary question. Is there any evidence about whether for 50 years or it's only more recent that you started doing what they accuse you of doing, which is doing something before you get to the sulfalane process that includes steps B and C? Your Honor, let me be clear. We do not dispute that we fractionate. I'm asking a timing question. There is no evidence in the record on that question, Your Honor. But I want to be clear. We don't dispute that there is fractionation as properly construed in this patent earlier in our process. It's just that, as Judge Flory said, the fractionation through distillation doesn't get you over 80% pure benzene. It only gets you to 57%, and that's undisputed. That's record 940, 941. It's the chart in the blue brief itself at page 15. And if the things we do that are fractionation through boiling points only get you to 57%, we're not getting over the 80% threshold that is the precise requirement at step 4. Your Honor, if Mr. Netzer had meant fractionation to include extraction, he could have written the patent to say fractionation or extraction, or he could have used the term separation in step 4, but he didn't. And, Your Honor, as to the other claims, my friend referred to other claims, and he said, well, look at these other claims, claim 3 and claim 11, that refer to conventional fractionation in a distillation column. That doesn't mean that fractionation is broader than distillation. I mean, cooking is a genus. Sautéing and baking are species. If I say I'm sautéing in a frying pan, it doesn't mean that frying includes baking. It doesn't mean that sautéing includes baking. A frying pan, like a distillation column,  So we would say that Netzer wrote this patent, and we know from his specification, so we don't need to get to the other patents, and we don't need to get to the extrinsic evidence at all, to define fractionation as different from extraction. And we know that he defined fractionation as boiling point separation, because he told us that it can't break azeotropes. If there wasn't an azeotrope problem with fractionation, if there wasn't a boiling point problem with the azeotropes, then fractionation wouldn't have a problem. So the specification at two really tells us that fractionation in this patent means separation by boiling point. And you need not go to the extrinsic evidence, Your Honor, which we admit is mixed. But we think that the better of the extrinsic evidence favors our interpretation of fractionation as boiling point separation. We think that you can read the dictionaries as well as the district court. We also think the district court, to the extent there's a factual question about the extrinsic evidence, he had this debate before him. My friend said, fractionation means any kind of separation. We said no, fractionation means separation by boiling point. The court had the extrinsic evidence. He resolved the claim construction in our favor and, by implication, rejected their extrinsic evidence. But, Your Honor, you need not go beyond the extrinsic evidence to hold that. Fractionation is properly construed as boiling point based. Netzer told us that in column two in the specification. He could have written it differently. He didn't. We don't practice any fractionation by boiling point at the point when we change benzene purity to be greater than 80%. We take it from 57% to 99% through extraction, not fractionation. The district court's judgment of non-infringement should be affirmed. Thank you. All right. I have two very quick points. First, there is evidence in the record on timing. At A949, Schell has a flow diagram that shows how they used to perform the process in February 2009, and they did not separate out a benzene-rich fraction. They did not crack it. Now, there wasn't depositions. We don't know. The point of the question, and I assume the point of the answer, is that it suggests there is actually some benefit to the sulfalane last step process of doing the steps B and 3, your new cracking process. Yes. Again, we don't know, but I do have in my reply brief what I believe to be an explanation for this. But again, we don't know. The timing of Schell's change was February 2009, and as we state in our reply brief, in 2007, EPA did lower the amount of benzene that was allowed in gasoline. So this is one major benefit of the patent. You take reformate that has benzene. You now can't use that reformate in your gasoline pool because the reformate has a lot of benzene. So using Netzer's invention, you get to take reformate that would normally go into the gasoline pool, separate out the benzene, and transfer it to your chemical processes to purify benzene. So that's why I believe Schell made this change. The timing was so that they could reduce the benzene in their gasoline. But again, without depositions, it's not something we know for sure. And that's about my time. So we do have... Sure. One more time. I mean, address what is... I take it actually the only argument, but it's not a bad argument from Schell, that Column 2 says you thought this up because there's a problem with not being able to use boiling point separation unless you do something because of the azeotropes, right? What is it that says, nevertheless, the solution you adopted to address that problem is a solution that we intend to be usable even when you don't use distillation but some other separation process after you've gone through it? Well, the best evidence I have for that is the file history, where the file history does admit at page A261 that this is a particularly good, useful method for creating dilute benzene. But they stopped short of disclaiming ultra-high pure benzene. Again, they had the chance to do it. They didn't do it. And that's what happened. Thank you. We thank both the Council and the cases submitted. Thank you.